Filed 2/24/16  P. v. Potts CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C078276 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F7995) |
| v. | |
| NOAH RYAN POTTS, | |
| Defendant and Appellant. | |

This case comes to us pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). Having reviewed the record as required by *Wende*, we affirm the judgment.

We provide the following brief description of the facts and procedural history of the case.  (See *People v. Kelly* (2006) 40 Cal.4th 106, 110, 124.)

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant shot and killed his brother, Sonny Potts.  Defendant was charged by first amended information with first degree murder (Pen. Code,[1] § 187, subd. (a)), a serious and violent felony within the meaning of sections 1192.7, subdivision (c), and

---

[1]  Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

667.5, subdivision (c)(1). The information also alleged defendant committed the offense while lying in wait (§ 190.2, subd. (a)(15)), and that he intentionally and personally discharged a firearm causing the victim great bodily injury or death (§ 12022.53, subd. (d)).

**Trial Evidence**

In November 2012, defendant was staying in a house in Big Bend owned by his father, Lester Potts, who had asked defendant to stay there in Lester's absence to preserve Lester's land assignment. Although Lester said he did not intend to return to the house, both he and defendant's brother, Sonny Potts, had moved back into the house several months prior.[2]

Defendant testified at trial that, in the months prior to the crime, Sonny had sexually assaulted him on several occasions. The first time occurred two and a half to three months prior to the incident. Defendant came home after drinking and using methamphetamine. Lester was passed out in the back bedroom. Sonny was high on methamphetamine and shadowboxing in front of the television. Defendant stripped down to his boxer shorts and a T-shirt and passed out on the bed in one of the bedrooms. He awoke to find Sonny holding him down and forcibly sodomizing him. Defendant managed to fight Sonny off and ran out of the house. A week later when defendant stopped by the house to get some clothing, Sonny cornered him in a hallway, grabbed him around the neck, gave him a sloppy kiss on the cheek, grabbed defendant's crotch and said, " 'Come on, brother. Give me some love.' " Defendant was able to get loose and leave the house. A third incident happened a month or so later, when Sonny pushed defendant up against the wall by the throat and held him there while Sonny pulled his own penis out and tried to force defendant's head down. Again, defendant managed to

---

[2] Because defendant's father and brother share a surname, we will refer to them by their first names.

fight Sonny off and escape.  Defendant, who was 5'8" and weighed under 200 pounds, was afraid of Sonny, who was six feet tall, weighed 300 pounds, and always carried a bar or a knife, and who had recently been released from prison and frequently used methamphetamine.  Defendant did not tell anyone about the assaults because he was embarrassed and he felt that he, as a Native American, was supposed to handle things himself.

On November 2, 2012, after working on a car together, defendant and Colin Kennedy decided to poach deer.  Defendant had met Kennedy a month or so prior and the two hung out, drank, and used drugs together, including methamphetamine and marijuana.  Throughout the day, both men had been drinking alcohol, smoking marijuana, and consuming methamphetamine.  With two rifles Kennedy had borrowed from friends -- a Winchester .22-caliber rifle with a scope and a Ruger .22 rifle without a scope -- defendant and Kennedy set off in Kennedy's truck to go hunting.

After killing a doe, Kennedy and defendant drove around looking for another deer. They talked here and there, including talking generally about child molesters and rapists. In that regard, Kennedy said, " 'These child molesters and rapists need to be taken out of this fuckin' town.' "  At some point during the night he also said, " 'We're going to start with the cleansing of the reservation.' "  As Kennedy made these statements, defendant thought about Sonny had done to him.

Eventually, Kennedy drove defendant home.  When they arrived, Sonny told Kennedy to park around back so Sonny could borrow Kennedy's spotlight.  Defendant got out of the truck and went inside.  When he walked to the back bedroom to retrieve a hat, Sonny stopped him and said, " 'Hey, what's up, little big brother?  Tonight I'm gonna show you what it's like to be real fuckin' Indian and their ain't nothin' your fuckin' punk white boy can do about it.' "  Defendant was afraid Sonny was going to try to rape him again, so he ran back out to the truck and sat in it before returning to the house.

3

Kennedy went inside the house, bringing with him his dog, some marijuana, and the Winchester. He saw defendant and Sonny smoking methamphetamine from a pipe. Kennedy introduced himself to Sonny, offered him some marijuana, and sat down to roll a joint.

Defendant retrieved some beer and whiskey from the truck and offered it to Kennedy and Sonny. Kennedy was sitting in a chair rolling a joint, Sonny was sitting in a recliner smoking methamphetamine out of a pipe, and Lester was in the back bedroom. Defendant, afraid of Sonny and certain Sonny was going to try to rape him again as soon as Kennedy left, stood four or five feet from Sonny, pointed the rifle towards Sonny's head, and shot him. Then he took a step closer and shot him a second time. Defendant later testified he had no intention of killing his brother prior to that night. At the time of the shooting, he felt "weird" and was feeling the effects of the alcohol and drugs he had consumed.

Kennedy had taken a swig from his beer and was setting it on the table when he heard a "loud pop." He turned and saw Sonny, who had blood pouring from his mouth, and defendant, who was standing behind Sonny holding the Ruger rifle pointed towards Sonny. Kennedy grabbed his dog and ran out of the house. As he did, he heard a second "pop."

Kennedy ran until he reached the driveway in front of the neighbor's house. Defendant followed him with the rifle still in his hand. When defendant caught up with him, Kennedy screamed, " 'What happened? What did you just do?' " He forcibly removed the rifle from defendant's hand, ejected the clip, and ejected the live round from the chamber. He told defendant, who had a "blank, absent" look on his face, to get away and go back to the house immediately. Kennedy ran to Jason Doan's house, dropping the clip somewhere along the way.

When Kennedy reached Doan's house, he told Doan, " 'I think [defendant] just killed his brother.' " Doan's ex-wife called the police. Kennedy hid under Doan's

4

kitchen sink because he was afraid of defendant. When police arrived, they seized the Ruger. Kennedy led them to the discarded clip between defendant's house and Doan's house. Kennedy testified at trial that he had no idea defendant planned to kill his brother, Sonny.

Meanwhile, Lester discovered Sonny's body and ran next door to ask his cousin to call the police.

Defendant initially lied, first telling detectives it was Kennedy who shot Sonny, then telling them he himself accidentally shot Sonny.

### Verdict and Sentencing

Defendant was tried by a jury and convicted of the lesser offense of voluntary manslaughter. (§ 192, subd. (a).)

The trial court denied probation and sentenced defendant to the upper term of 11 years in state prison. The court imposed a $2,640 restitution fine (§ 1202.4), a $2,640 parole revocation fine, stayed pending successful completion of parole (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction assessment (Gov. Code, § 70373), reserved the issue of victim restitution, and found defendant did not have the ability to pay attorney fees in the amount of $13,800. The court awarded defendant 913 days of presentence custody credit (794 actual days, plus 119 conduct credits).

Counsel filed an opening brief that sets forth the facts of the case and requests that we review the record and determine whether there are any arguable issues on appeal. (*Wende, supra*, 25 Cal.3d 436.) Defendant was advised by counsel of the right to file a supplemental brief within 30 days of the date of filing of the opening brief. More than 30 days have elapsed, and we have received no communication from defendant.

### *WENDE* REVIEW

Having undertaken an examination of the entire record, we find no arguable error that would result in a disposition more favorable to defendant.

5

**DISPOSITION**

The judgment is affirmed.

      MURRAY     , J.

We concur:

     HULL     , Acting P. J.

     RENNER     , J.

6